WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alicia Smith, | No.  CV-19-01586-PHX-DMF |
| Plaintiff, | |
| v. | **ORDER** |
| Commissioner of Social Security Administration, | |
| Defendant. | |

At issue is Defendant ("Commissioner")'s decision to deny Plaintiff Alicia Smith's ("Claimant")'s application for Title II Disability Insurance Benefits under the Social Security Act ("Act").  Claimant filed a Complaint seeking judicial review of the decision. (Doc. 1.)[1]   The Court now considers Claimant's Opening Brief (Doc. 19), the Commissioner's Response (Doc. 21), Claimant's Reply (Doc. 22), and the Administrative Record (Doc. 15).  For the following reasons, the Court will order the final decision of the Commissioner to be vacated and will remand this matter to the Commissioner for further proceedings consistent with this Order.

## I.    BACKGROUND

### A.    Application and Social Security Administration review

Claimant was 52 when she filed an application on October 20, 2014, for Title II Disability Insurance Benefits and alleged disability as of October 9, 2009.  (Doc. 15-3 at

---

[1] Citation to the record indicates documents as displayed in the official Court electronic document filing system maintained by the District of Arizona under Case No. CV-19-01586-PHX-DMF.

26, Doc. 15-6 at 18)  Claimant had filed a prior Title II application on May 19, 2011, which was denied by an administrative law judge ("ALJ") on January 3, 2013.  (Doc. 15-3 at 26) Claimant was found to be not disabled on initial state agency review in September 2015. (Doc. 15-4 at 67)  On reconsideration, the state agency reviewers determined there had not been changed circumstances in Claimant's case after she received an unfavorable decision in 2013 in her prior application and concluded that Claimant was "still able to perform [her] past work as a machine operator."  (*Id.* at 91)  At her hearing before the ALJ on September 15, 2017, Claimant amended the alleged onset date of disability to April 9, 2015, based on a consultative examination report.  (Doc. 15-3 at 80-81)  The ALJ issued a decision finding Claimant "not disabled."  (*Id.* at 26-43)  The Appeals Council upheld the decision in a notice dated January 7, 2019, and the decision became final (*Id.* at 2-4). *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012).

**B.     Relevant medical treatment and imaging**

Claimant must establish disability between her alleged onset date of April 9, 2015, and her date last insured of June 30, 2015.  *Flaten v. Sec. of Health & Human Servs.*, 44 F.3d 1453, 1461 n.4 (9th Cir. 1995).  Claimant addresses the portion of her medical records with dates approaching her amended alleged onset of disability date of April 9, 2015.  (Doc. 19 at 6)  She appropriately does not address medical records date prior to January 30, 2014, or after October 20, 2015.  (Doc. 19 at 6-12)

*1.     Eric Feldman, M.D., The CORE Institute*

In January 2014, Claimant was seen by Dr. Feldman for neck and lower back pain that Claimant rated as eight out of ten.  (Doc. 15-12 at 101-102)  She reported her back pain was aggravated by bending, leaning back, sitting, standing, walking and other physical activity, lying flat, lying with bent knees and hips, and getting out of a bed or a chair.  (*Id.* at 101)  She stated her neck pain was worsened by moving her head or using her arms above her head.  (*Id.*)  Dr. Feldman prescribed Claimant Oxycodone, Gabapentin and Cymbalta for pain.  (*Id.* at 101)  The doctor stated that Claimant got "relief from her pain medications and denied any side effects.  (*Id.* at 105)  Claimant demonstrated limited range

of motion in her neck and lumbar spine due to pain, but she also exhibited normal strength. (*Id.* at 103-104)  Dr. Feldman reported Claimant had obtained "excellent relief" from steroid injections to her neck and low back for two to three months such that she was "able to function much better with significant improvement in her overall pain."  (*Id.* at 105)  Stating that the effects of the injections had "worn off," the doctor ordered additional injections.  (*Id.*)  Claimant received injections to her sacroiliac on February 7, 2014.  (*Id.* at 107)

In April 2014, Dr. Feldman reported Claimant's self-reported limitations due to pain as including sitting and standing tolerance of only 5 to 10 minutes, leg fatigue and pain while walking, a walking distance prior to pain onset of just one block, and that nothing relieved Claimant's pain while walking.  (*Id.* at 110)  The doctor noted that Claimant had obtained "very good relief" from her injections and wanted to repeat them.  (*Id.* at 113)  Claimant reported neck and low back pain rated at 8 out of 10.  (*Id.* at 109)  The doctor performed the injection procedures on May 16, 2014.  (*Id.* at 115)

In September 2014, Claimant's neck and lower back pain remained unchanged.  Dr. Feldman noted Claimant's substantial pain relief following her injections in May 2014 and ordered additional injections.  (*Id.* at 120)  The doctor stated that Claimant complained of "widespread myofascial pain."  (*Id.*)  Claimant underwent sacroiliac injections on November 6, 2014.  (*Id.* at 122-123)

On a follow up appointment in March 2015, Claimant reported low back pain rated at 6 out of 10 but radiating leg pain rated at 8 out of 10.  (*Id.* at 129)  Her lumbar spine range of motion was within functional limits but painful at end range of motion.  (*Id.* at 131)  Dr. Feldman ordered additional sacroiliac injections and noted that Claimant reported pain and paresthesia in her hands consistent with carpal tunnel syndrome.  (*Id.* at 132)  The doctor further documented Claimant's reports of neck pain accompanied by radicular left greater than right arm pain and paresthesias.  (*Id.*)  Dr. Feldman performed bilateral sacroiliac joint injections on Claimant on April 21, 2015.  (*Id.* at 137)

Claimant was seen by Dr. Damon Adamany of The Core Institute on April 28, 2015, for continuing pain in her wrist and hand.  (*Id.* at 139-142)  Claimant complained of numbness and tingling and weakness in her hands and said her hand felt clumsy.  (*Id.* at 139)  Dr. Adamany diagnosed bilateral carpal tunnel syndrome and mentioned that she may have neuropathy.  (*Id.* at 141)  The doctor recommended Claimant wear a Velcro wrist splint for a month and return for a follow up examination.  (*Id.*)

In May 2015, Claimant reported low back and leg pain severity of 7 out of 10.  (*Id.* at 143)  In August 2015, Claimant reported significant relief from her previous sacroiliac injections and asked that the procedure be again performed.  (*Id.* at 151)  Dr. Feldman stated that Claimant had gone to the emergency room with chest pain and left arm pain with paresthesia.  (*Id.*)  She was advised at the hospital that her symptoms "were most likely due to fibromyalgia."  (*Id.*)  Dr. Feldman stated that he felt "the majority of [Claimant's] symptoms are related to fibromyalgia."  (*Id.*)  The doctor prescribed Cymbalta.  (*Id.* at 149, 152)

## 2.    *Anjali Iyengar, M.D.*

Claimant was treated by hematologist Dr. Iyengar for iron and vitamin B12 deficiencies.  (Doc. 15-9 at 129)  In January 2014, Claimant reported feeling better after receiving intravenous iron.  (*Id.* at 129)  Dr. Iyengar recorded that Claimant's musculoskeletal system was "abnormal" due to lower back, leg, and arm pain for which Claimant had been prescribed oxycodone.  (*Id.*)  Dr. Iyengar assessed Claimant's "performance status" as permitting "no physically strenuous activity," but that she was "ambulatory and able to carry out light or sedentary work (e.g., office work, light housework)." (*Id.* at 130)

Dr. Iyengar referred Claimant for an ultrasound scan of her left leg in June 2014 that revealed a blood clot persisting in her left peroneal vein.  (*Id.* at 118)  The doctor recommended Claimant continue on an anticoagulant for an additional three months.  (*Id.* at 117)  In January 2015, Dr. Iyengar reported that as of September 2014, the clot had resolved and the anticoagulant treatment was discontinued.  (*Id.* at 103)

3.      *Integrated Medical Services, Michael R. Keller, M.D., Kamel Sadek, M.D., Thomas Martin, PA-C, Michael Weng, M.D.*

In February 2014, one of Claimant's primary care providers, Michael Keller, M.D., treated her for cervical radiculopathy, headache, low back pain, and lumbar radiculopathy. (Doc. 15-10 at 72-75)  In March 2014, Thomas Martin, PA-C, reported that Claimant had neck, shoulder, and arm pain, but no upper extremity numbness, stiffness, or decreased range of motion.  (*Id.* at 67-71)  He also noted that Claimant had deep vein thrombosis in her leg.  (*Id.* at 7)  In April 2014, Claimant was treated for iron deficiency, anemia, and vitamin B-12 deficiency.  (*Id.* at 54-58)  Dr. Keller reported in June 2014 that Claimant had suffered a period of moderate depression.  (*Id.* at 45-48)  In July 2014, PA-C Martin prescribed a medication to treat chronic fatigue syndrome.  (*Id.* at 38)  Dr. Keller stopped Claimant's blood thinner in September 2014 and added a prescription to treat Claimant's chronic fatigue.  (*Id.* at 26-29)  In December 2014, Dr. Keller indicated that Claimant reported constant, severe low back pain that was uncontrolled and had "no obvious cause." (*Id.* at 21)  Dr. Keller reported Claimant said the pain was better with rest and worse with exercise or activity.  (*Id.*)  He also noted Claimant's complaints of pain radiating down both legs, with weakness and numbness in both legs.  (*Id.*)

In January 2015, Kamel Sadek, M.D., saw Claimant for complaints of moderate insomnia and moderate depression with no specific cause or association.  (*Id.* at 16-17)  In February 2015, Claimant complained of arm, leg and knee pain.  (*Id.* at 11-15)  Claimant described her leg pain as associated with swelling, stiffness, difficulty bearing weight, calf tenderness, numbness, tingling, hip and thigh pain, and difficulty walking.  (*Id.* at 11)  Claimant stated she was stable on medication.  (*Id.*)  It was noted that Claimant had been "evaluated for a spinal stimulator, but does not want to follow that course at this time." (*Id.*)

In March 2015, Dr. Sadek reported that Claimant's back pain was constant, controlled, moderate in severity, and made better with rest and worse with exercise or activity.  (*Id.* at 5)  Dr. Sadek described Claimant's neck condition as causing pain,

decreased range of motion, muscle spasms, migraine headaches, and other limitations affecting her "general activity, mood and sleep." (*Id.* at 5-6)  Claimant reported "good compliance with treatment, good tolerance of treatment and good symptom control." (*Id.* at 6)  It was documented that Claimant had no associated "shoulder pain, no arm pain, no upper extremity weakness[,]" numbness, or stiffness or tingling.  (*Id.* at 5)  Dr. Sadek concluded that Claimant's neck pain was responding to treatment.  (*Id.* at 9)

On April 1, 2015, Claimant presented with left knee pain.  (Doc. 15-11 at 18-20) Michael Weng, M.D., assessed her with a left knee medial meniscus tear and prescribed ice, heat and over-the-counter pain reliever.  (*Id.* at 20)  On April 16, 2015, Dr. Sadek indicated Claimant may have bilateral carpal tunnel syndrome and that the condition was worsening.  (Doc. 15-13 at 51)  He suggested referral to a specialist.  (*Id.*)  On April 28, 2015, the doctor documented Claimant's hand pain and tingling, weakness and numbness, with associated weakened grasp and pain sensitivity.  (*Id.* at 41)  In May 2015, Claimant was seen for continued knee pain that increased with activity.  (Doc. 15-11 at 15-17)  The doctor assessed a medial meniscus tear and referred Claimant for a surgical consultation. (*Id.* at 17)

### 4.   *Albert Klaski, M.D.*

In April 2014, Claimant consulted with Dr. Albert Klaski about headaches lasting two to three hours daily.  (Doc. 15-9 at 36-39)  Claimant complained of awakening several times each night and being very tired with daytime significant fatigue such that she could nap at any time.  (*Id.* at 36)  Dr. Klaski reported Claimant demonstrated normal gait and balance, and normal muscle tone.  (*Id.* at 38)  Dr. Klaski assessed Claimant with analgesic overuse headache, migraine headache, occipital neuralgia, and sleep apnea.  (*Id.*)

Claimant underwent a sleep study on May 6, 2014.  (*Id.* at 29-30)  She met again with Dr. Klaski later in May 2014.  Dr. Klaski reported that Claimant's sleep study was normal, and that a CT scan of her brain was also normal.  (*Id.* at 26)  The doctor prescribed a new prescription medication regime and recommended "bilateral greater occipital nerve blocks for improved headache control."  (*Id.* at 28)

1

2             5.     *Spooner Physical Therapy*

Claimant was assessed for physical therapy on June 3, 2015.  (Doc. 15-11 at 32-34)

3 Claimant reported she "was supposed to have a stimulator put in her back but she didn't

4 want to do this.  She has done injections, [transcutaneous electrical stimulation unit],

5 patches, but has difficulty taking medicine."  (*Id.* at 32)  The therapist noted Claimant was

6 "restricted in all planes of motion in the [cervical]-spine by 75% and quality of motion is

7 very poor[,]" and also limited in lumbar spine motion as well as elevation in her shoulders.

8 (*Id.* at 33)  The therapist also documented Claimant's upper and lower extremity strength,

9 "with poor quality of contraction."  (*Id.* at 33)  He noted Claimant had an antalgic gait.  (*Id.*

10 at 31)  After some therapy sessions, on June 19, 2015, the physical therapist reported that

11 Claimant said she liked the therapy sessions because they relaxed her, and that Claimant

12 was "able to perform exercises appropriately and without any increase in symptoms."  (*Id.*

13 at 27)  At the end of June 2015, Claimant reported "doing a little bit better at this point[.]"

14 (*Id.* at 25)

15             6.     *Imaging and testing*

16 Claimant underwent a duplex scan of her extremity veins in June 2014.  (Doc. 15-9

17 at 118)  Thrombus was observed in her left peroneal vein.  (*Id.*)

18 On April 6, 2015, Dr. Feldman conducted an electrodiagnostic evaluation of

19 Claimant's bilateral hand pain and paresthesias.  (Doc. 15-12 at 134-136)  The doctor

20 recorded impressions of "electrodiagnostic evidence of a mild, primarily sensory, median

21 neuropathy at the right wrist consistent with carpal tunnel syndrome.  There is no

22 denervation present."  (*Id.* at 134)  He also recorded no evidence of "a cervical

23 radiculopathy, brachial plexopathy or a peripheral polyneuropathy."  (*Id.*)

24 On April 1, 2015, Claimant underwent x-rays of her left knee.  (Doc. 15-13 at 71)

25 The findings indicated "[n]o acute fracture or malalignment.  Joint spaces are relatively

26 preserved.  No discrete focal osseous lesions.  No significant joint effusion."  (*Id.*)  The

27 impression was of "unremarkable left knee radiographs."  (*Id.*)

28

Also on April 1, 2015, Claimant had imaging done of her lumbar spine.  (Doc. 15-10 at 239)  The doctor reviewing the imaging found "no significant subluxions[,]" that the intervertebral disc spaces "were preserved[,]" "some minimal spurring at the anterior margin of the vertebral bodies[,]" and "[p]ossible minor facet arthropathy in the lower lumbar spine with some sclerosis noted."  (*Id.*)

In August 2015, x-ray imaging was conducted on Claimant's cervical spine.  (Doc. 15-13 at 70)  The findings indicated "no osseous abnormality.  The alignment is normal. There is no prevertebral soft tissue swelling.  There is no fracture."  (*Id.*)  The impression was of an "unremarkable exam."  (*Id.*)

C.   **Medical source statements**

1.   *Eric Feldman, M.D.*

Dr. Feldman completed a "Residual Functional Capacity Questionnaire" regarding Claimant on November 13, 2009.  (Doc. 15-9 at 92-94)  Dr. Feldman reported he had seen Claimant every two to three months from November 2012 to the date of the questionnaire. (*Id.* at 92)   The doctor listed Claimant's diagnoses as fibromyalgia and chronic pain syndrome, and her symptoms as "chronic widespread pain, fatigue, low back pain [and] paresthesias in hands and feet."  (*Id.*)  Dr. Feldman opined that Claimant's symptoms were "constantly" severe enough to interfere with "the attention [and] concentration required to perform simple work-related tasks."  (*Id.*)  Dr. Feldman indicated that Claimant would need to lie down or recline during a hypothetical 8-hour day "in excess of the typical 15-minute break in the morning, the 30 to 60 minute lunch, and the typical 15-minute break in the afternoon."  (*Id.*)  The doctor stated that Claimant could not walk even a single city block without rest or significant pain.  (*Id.*)

Dr. Feldman estimated that if Claimant were "placed in a competitive work situation on an ongoing basis" she would be limited to:  (1) sitting for 15 minutes at a time; (2) standing/walking for 5 to 10 minutes at a time; (3) sitting for 1 to 2 hours during and 8-hour workday; and (4) standing or walking for 0 to 1 hour during an 8-hour workday.  (*Id.*) Dr. Feldman stated that Claimant would need to shift positions at will from sitting,

standing, or walking, and would need to take unscheduled breaks every 15 to 20 minutes for 5 minutes.  (*Id.*)  The doctor opined that Claimant could occasionally lift and carry 10 pounds or less and never lift and carry items greater than 10 pounds.  (*Id.* at 93)  He stated that Claimant was limited in performing repetitive reaching, handling or fingering and could use:  (1) either hand to grasp, turn, or twist objects for 10% of an 8-hour workday; (2) her fingers on either hand for fine manipulation for 10% of an 8-hour workday; and (3) her arms or reaching for 5% of an 8-hour workday.  (*Id.*)  Dr. Feldman determined that Claimant would need to miss more than 4 days a month as a result of her impairments or treatments.  (*Id.*)  The doctor concluded that Claimant was not "physically capable of working an 8-hour day, 5 days a week employment on a sustained basis."  (*Id.*)

> ### 2.     Michael R. Keller, M.D.

On December 23, 2014, Michael Keller, M.D., completed a "Mental Capacity Assessment" of Claimant.  (Doc. 15-9 at 97-99)  Dr. Keller indicated that Claimant had only "slight" limitation in understanding and memory, "slight" to no limitations in her ability for sustained concentration and persistence[2], no limitations in social interaction, and "slight" to no limitations in adaptation.  (*Id.*)

> ### D.    Examining consultative evaluations

> ### 1.     Donald Fruchtman, D.O.

Donald Fruchtman, D.O., conducted a consultative examination of Claimant on April 9, 2015.  (Doc. 15-10 at 241-249)  Dr. Fruchtman reviewed Claimant's medical records spanning the period between October 8, 2009, and April 2013.  (*Id.* at 241-242)  The doctor noted that Claimant used a cane which she reported had been prescribed.  (*Id.* at 243)  He observed Claimant was not comfortable sitting and moved stiffly as she moved from her chair to the exam table, and needed help putting her shoes back on her feet.  (*Id.*)  The doctor documented that Claimant was able to turn a doorknob, manipulate a button, and pick up a coin from the desk.  (*Id.*)  Claimant was only able to walk a few steps without

---

[2] Dr. Keller stated it was "unknown" how many absences Claimant might have in an average month, or the extent of Claimant's ability "to perform at a consistent pace with a standard number and length of rest periods.

a cane, and her gait appeared labored.  (*Id.* at 244)  She was not able to perform toe-heel walking and was able to stand on her toes and on her heels only with support.  (*Id.*)  Similarly, she was able to stand on her right foot and then her left foot by holding on to the doctor.  (*Id.*)  She commented that she felt like she was going to fall all the time.  (*Id.*)  Dr. Fruchtman indicated he did not think a cane was medically necessary.  (*Id.*)

Dr. Fruchtman documented a very restricted range of motion in Claimant's neck and lower back.  (*Id.* at 244-245)  Her hip range of motion also was significantly limited.  (*Id.* at 245)  Claimant exhibited pain in her knees.  (*Id.*)  Claimant demonstrated normal range of motion in her ankles, elbows, wrists, and fingers, although she indicated symptoms of carpal tunnel syndrome in her wrists.  (*Id.*)  Her shoulder range of motion was significantly restricted.  (*Id.*)

Dr. Fruchtman noted that Claimant demonstrated 18 out of 18 trigger points for fibromyalgia and "a typical 'do not touch me syndrome'" making it difficult to assess ranges of motion.  (*Id.* at 245)  Claimant exhibited full motor strength in her upper and lower extremities and her grip strength.  (*Id.* at 246)  The doctor noted that when checking whether Claimant could feel a light touch, in certain areas Claimant said she could not feel the touch, but when he later touched her in those areas, she did feel it.  (*Id.*)  Dr. Fruchtman stated he doubted that Claimant's symptoms were due to degenerative disc disease or degenerative joint disease.  (*Id.*)  Instead, he concluded that her major diagnosis was fibromyalgia accompanied by a "do not touch me syndrome" possibly caused by "a type of conversion reaction."  (*Id.*)

Dr. Fruchtman opined that Claimant could frequently lift and/or carry 10 pounds and stand and/or walk for at least 4 hours in an 8-hour workday, but not more than an hour or two at a time.  (*Id.* at 247)  The doctor stated that Claimant had no limitations in sitting and concluded she was capable of sitting 6 to 8 hours in an eight-hour workday.  (*Id.* at 247-248)  Dr. Fruchtman estimated that Claimant could frequently balance and use her hands for handling, fingering, and feeling and occasionally climb, stoop, kneel, crouch, crawl, and reach.  (*Id.* at 248)  The doctor concluded that Claimant could not work around

heights or moving machinery but would not be restricted from working around extremes in temperature, chemicals, dust/fumes or gases, or excessive noise.  (*Id.* at 249)

Dr. Fruchtman opined that because Claimant had fibromyalgia and chronic pain, she was not capable "right now" of a full time position and that he would "probably restrict her to a part time because of the chronicity of her problems."  (*Id.*)

### 2.    Shaunna Sukey Haley, Psy.D.

On April 15, 2015, Dr. Haley conducted a psychological survey of Claimant (Doc. 15-11 at 2-7) and provided a mental status exam (*Id.* at 8-9).  Dr. Haley indicated that Claimant was bilingual and "speaks both Spanish and English.  An interpreter was not needed for the exam."  (*Id.* at 2)  Dr. Haley observed it was an "effort" for Claimant to rise from her seated position, that she "transitioned between sitting and standing," "paced the examiner's office with her cane[,]" and reported a subjective pain rating of 8 out of 10."  (*Id.* at 3)  Claimant reported that her hobby was watching TV because she couldn't "really do anything."  (*Id.*)  Claimant reported difficulty in high school with reading, English, and math.  (*Id.* at 4)  Based on Claimant's reports, Dr. Haley indicated that Claimant had difficulties with sitting, walking, and standing and used a cane.  (*Id.* at 6)  Claimant told Dr. Haley she could do light chores, depending on how she felt, and that she was not able to drive, perform yard work, or take care of the house.  (*Id.*)  Claimant reported her boyfriend did most of the cooking and that her sister and her boyfriend helped with the laundry.  (*Id.*)  Claimant further told Dr. Haley that she would go shopping with her boyfriend but just sit down and wait for him.  (*Id.*)  She indicated that she could not write well in English.  (*Id.* at 7)

Based on the examination of Claimant, Dr. Haley noted Claimant's deficiencies in delayed recall and that she needed reminders to take her medications.  (*Id.* at 8)  Claimant was able to understand and answer simple questions.  (*Id.*)  Claimant demonstrated only "minimal evidence of distractibility" and questions did not need to be repeated.  (*Id.*)  Dr. Haley opined that Claimant "may be able to complete simple tasks only that do not require reading, writing, or significant concentration."  (*Id.* at 9)  Dr. Haley concluded that

Claimant was not capable of managing benefit payments in her own interest.  (*Id.*)

## E.   State agency non-examining consultant assessments

### 1.   *Rosalia Pereyra, Psy.D. and Melvin Roberts, M.D.*

On initial review of Claimant's application, non-examining consultative reviewers Rosalia Pereyra, Psy.D., and Melvin Roberts, M.D., provided two opinions on Claimant's limitations.  In his first opinion dated August 18, 2015, Dr. Roberts assessed Claimant's medical records as of July 6, 2015.  (Doc. 15-4 at 20-42)  He opined that Claimant would be limited to sedentary work and that she could stand and/or walk for a total of 2 hours in an 8-hour workday.  (*Id.* at 36, 41)  In his subsequent opinion dated September 30, 2015, Dr. Roberts reviewed Claimant's medical records as of September 22, 2015.  (*Id.* at 44-67)  Dr. Roberts altered his opinion to find that Claimant was limited to light work and that she was able to stand and/or walk for a total of 6 hours in an 8-hour workday.  (*Id.* at 62, 66)  Dr. Roberts further noted that Claimant's limited range of motion was caused by Claimant's subjective complaints of pain, and that Dr. Fruchtman observed Claimant had equal balance with or without her use of a cane.  (*Id.* at 62)  Regarding the finding of 18 out of 18 trigger points, Dr. Roberts declared there was a "paucity of abnormal physical findings[,]" specifically referencing the Spooner Physical Therapy notes.[3]  (*Id.*)

### 2.   *Jamie Bludworth, Ph.D. and Yousef Schwartz, M.D.*

On reconsideration, the reviewers examined records received as of September 2013.  (Doc. 15-4 at 69-91)  The reviewers concluded that although Claimant was subject to limitations in the performance of certain work activities, the limitations would not prevent her from performing her past relevant work as a machine operator.  (*Id.* at 89)  Claimant was again found to be not disabled.  (*Id.* at 68, 90)

. . .

. . .

---

[3] In the August 2015 opinion, the reviewers noted that the Spooner Physical Therapy records indicated Claimant was able to perform exercises "as prescribed for 55 minutes with no difficulty and no increase in symptoms or untoward events."  (Doc. 15-4 at 38)  The records do not indicate what these exercises consisted of.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.     STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this court must affirm the Commissioner's decision to adopt the ALJ's findings if her findings are supported by substantial evidence and are free from reversible error.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).  "Substantial evidence is more than a mere scintilla, but less than a preponderance." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).  "It is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)).

In determining whether substantial evidence supports the ALJ's decision, the court considers the whole record, weighing both the evidence that supports and that which detracts from the ALJ's conclusions. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The ALJ is responsible for resolving conflicts in medical testimony, ambiguity in the record, and determining credibility.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  If there is sufficient evidence to support the ALJ's outcome, the Court cannot substitute its own determination. *See Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990). Although the Court "must do more than merely rubberstamp the ALJ's decision[,]" *Winans v. Bowen*, 853 F.2d 643, 645 (9th Cir. 1988), where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citations omitted).

## III.    LEGAL STANDARDS

Claimant bears the burden of proving disability under the Social Security Act. *Tidwell v. Apfel*, 161 F.3d at 601.  She meets this burden if she can establish that she has a physical or mental impairment that prevents her from engaging in any substantial gainful activity and which is expected to result in death or to last for a continuous period of at least one year.  42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A).  Claimant's impairments must be such that she is not only unable to perform her past relevant work, but she cannot, considering her age, education and work experience, engage in other substantial gainful work existing in the national economy.  *Id.* at §§ 423(d)(2) and 1382c (a)(3)(B).

1   The Commissioner applies a five-step sequential process to evaluate disability.  20
2   C.F.R. §§ 404.1520 and 416.920.  In the first three steps, the Commissioner determines:
3   (1) whether a claimant has engaged in substantial gainful activity since the alleged onset;
4   (2) whether she has a "severe" impairment or a combination of impairments that is
5   "severe"; and (3) whether the severity of any impairment meets or equals the severity of
6   any impairment in the Listing of Impairments (20 C.F.R. Pt. 404, Subpt. P, App. 1).  *Id.*  If
7   a claimant complies with these three steps, she will automatically be found disabled; if the
8   claimant satisfies steps one and two but not three, she must then satisfy step four.  *Id.*

9   Before considering step four, the ALJ must assess the claimant's residual functional
10  capacity ("RFC"), *see* 20 C.F.R. § 404.1520(a)(4)(iv), which is "the most [claimant]
11  can still do despite [the claimant's] limitations." *Treichler v. Comm'r of Soc. Sec. Admin.*,
12  775 F.3d 1090, 1097 (9th Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)).  The RFC
13  assessment is "based on all the relevant medical and other evidence" in the claimant's
14  record. *Id.* (quoting 20 C.F.R. § 404.1520(e)).  In determining a claimant's RFC, the ALJ
15  must consider all of a claimant's medically determinable impairments, including those that
16  are not severe.  20 C.F.R. § 404.1545(a)(2).

17  At step four, the ALJ considers the claimant's RFC and past relevant work.  20
18  C.F.R. § 404.1520(a)(4)(iv).  If a claimant can perform her past relevant work, she is not
19  found to be disabled. *Id.*

20  When a claimant satisfies step four, the burden shifts from her to the Commissioner
21  to establish the claimant is able to perform work in the national economy. *Tackett v. Apfel*,
22  180 F.3d 1094, 1098 (9th Cir. 1999) (claimant bears the burden of proof on the first four
23  steps, but the burden shifts to the Commissioner at step five).  The fifth and final step
24  involves the ALJ's decision whether a claimant can make an adjustment to other work,
25  given the ALJ's assessment of the claimant's RFC and age, education and work experience.
26  20 C.F.R. § 404.1520(a)(4)(v).

27  . . .
28  . . .

## IV.    ADMINISTRATIVE HEARING

On September 15, 2017, ALJ Carla Waters conducted an administrative hearing at which Claimant was represented by counsel and used an interpreter to translate from English into Spanish.  (Doc. 15-3 at 76-77)  Claimant explained that she had three adult children and lived with her son and her boyfriend.  (*Id.* at 82)  Claimant said her current income source was long-term disability payments.  (*Id.*)  She stated she was unable to drive because of her medications.  (*Id.*)  Claimant testified that the highest grade she finished in school was ninth grade, in California.  She said she was able to speak or understand English, "a little bit."  (*Id.* at 82-83)

Claimant explained that she last worked in October 2009 when she had an accident at work, after which she received workman's compensation and then long-term disability payments.  (*Id.* at 83)  Claimant declared the medical conditions preventing her from working included lower back pain, problems with her left knee, fibromyalgia, and arthritis.  (*Id.* at 83-84)  She explained that her doctor wanted to place a stimulator in her back, but that she was "too scared."  (*Id.* at 84)  Claimant said her pain medications helped her "[a] little bit, not very much."  (*Id.* at 86)  She further stated that some of her pain medications made her sleepy.  (*Id.*)  Claimant told the ALJ that steroid injections in her back helped her for one month, and that she had engaged in physical therapy for 10 sessions that were covered by insurance.  (*Id.* at 87)  She explained that she used a cane and said the cane had been prescribed by Dr. Sadek three years before.  (*Id.*)

On questioning by her attorney, Claimant answered that changing from sitting to standing helped her pain but did not eliminate it.  (*Id.* at 90)  Claimant further explained that she did not feel she was able to engage in full-time work because she could not move or lift heavy things, and because sometimes in her mind she didn't "feel like myself."  (*Id.*)

The ALJ inquired of the Vocational Expert ("VE") about a hypothetical individual who could work at a light exertional level, but would be limited to standing and walking for a total of 2 hours in an 8-hour workday, and who would "be able to perform simple routine and repetitive work tasks involving simple work-related decisions and simple

instructions." (*Id.* at 93)  The VE advised that this individual would be unable to perform Claimant's past work because of the limitation in standing and walking.  (*Id.* at 94)  The VE provided examples of work at a light exertional level in which an individual could sit and stand while performing the job, including parking lot cashier, electrical accessories assembler, and small parts assembler.  (*Id.*)  The VE advised the ALJ that her identification of these positions did not take language ability into consideration.  (*Id.*)

The ALJ posed another hypothetical in which the individual could perform work at the light exertional level and who could perform simple routine and repetitive work tasks requiring simple work-related decisions and simple instructions.  (*Id.* at 95)  The VE advised the ALJ that such an individual could perform Claimant's past work as generally performed.  (*Id.*)

The VE opined that if the individual were unable to use foot controls, this would not rule out Claimant's past work and also would not rule out the jobs the VE identified regarding the first hypothetical.  (*Id.* at 96-97)  The VE instructed that there would be no work for an individual who is constantly off task.  (*Id.* at 97)  Similarly, the VE opined there would be no work for an individual who required the ability to recline or lie down in excess of the typical morning, afternoon, and lunch breaks and take unscheduled breaks of 5 minutes every 15 to 20 minutes.  (*Id.*)  Likewise, the VE explained there would be no work for an individual who needed to be absent more than four times a month, or for an individual who was limited in using her hands to grasp, turn, and twist objects only 10% of the day, use her fingers for fine manipulation only 10% of the day and use her arms for reaching only 5% of an 8-hour workday.  (*Id.*)  In contrast, the VE advised the ALJ that an individual requiring a cane for ambulation would not rule out the three positions the VE identified for the first hypothetical.  (*Id.* at 98)

## V.   ALJ's DECISION

The ALJ issued her unfavorable decision on March 21, 2018.  (Doc. 15-3 at 26-43)  The ALJ recognized that Claimant had "filed a prior Title II application on May 19, 2011" and another ALJ in that matter had issued an unfavorable decision.  (*Id.* at 26)  The ALJ

found that Claimant had "rebutted the presumption of continuing non-disability and had shown 'changed circumstances' indicating greater disability" such that the "presumption of continuing non-disability [did] not apply. (*Id.* at 29)

The ALJ stated that Claimant's date last insured was June 30, 2015, meaning Claimant must establish disability on or before that date to qualify for benefits. (*Id.*) The ALJ concluded Claimant had not engaged in substantial gainful activity from April 9, 2015, her amended alleged onset date, through her date last insured. (*Id.*)

The ALJ found that Claimant, through her date last insured, suffered from the severe impairments of degenerative disc disease, history of iron deficiency anemia, status post left lower extremity deep venous thrombosis, gastroesophageal reflux disease, cervical radiculopathy, depression, and fibromyalgia. (*Id.*) The ALJ further found that Claimant suffered from the non-severe impairments of headaches and carpal tunnel syndrome. (*Id.* at 33-34) Additionally, the ALJ indicated Claimant did not have a single impairment or a combination of impairments meeting or equaling the severity of a listed impairment. (*Id.* at 34-35)

The ALJ concluded that through Claimant's date last insured of June 30, 2015, she retained the RFC to perform "light work as defined in 20 CFR 404.1567(b)" except that she was limited to:  standing and walking for two hours in an 8-hour work day; only occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; frequently balancing, stooping, and crouching; occasionally kneeling and crawling; frequently reaching overhead; and having no exposure to hazards. (*Id.* at 35) The ALJ also found Claimant was able to "perform simple, routine, and repetitive tasks involving simple work-related decisions and simple instructions." (*Id.*)

The ALJ concluded that "given the claimant's history of chronic pain, including degenerative disc disease and fibromyalgia, restriction to the light exertional level was appropriate prior to the date last insured." (*Id.* at 35) The ALJ found the record, including opinion evidence, supported the RFC she had determined. (*Id.* at 41) The ALJ determined that Claimant was not able to perform her past relevant work and that because Claimant's

past relevant work was unskilled, transferability of job skills was not at issue.  (*Id.* at 41-42)

The ALJ concluded that Claimant had received "a limited education and is able to communicate in English."  (*Id.* at 41)  Although the ALJ noted that Claimant participated at her hearing using an English/Spanish language interpreter, the ALJ also emphasized that Claimant had communicated in English at her previous hearing and had explained then that although she did not "speak English that well," she was able to understand and answer the questions.  (*Id.*)  Further, the ALJ declared that none of Claimant's treating physicians documented the need for consultation in Spanish, the use of an interpreter, or difficulties communicating with Claimant in their treatment notes.  (*Id.* at 42)  The ALJ observed that Dr. Haley reported that Claimant was bilingual in Spanish and English, although Spanish was her primary language.  (*Id.*)

Based on VE testimony at the hearing, the ALJ identified the representative occupations of electrical accessories assembler and small parts assembler within the RFC she determined for Claimant.  (*Id.* at 43)  The ALJ found that Claimant had not been under a disability as defined in the Social Security Act from her amended alleged onset date of April 9, 2015, through June 30, 2015, the date last insured.  (*Id.*)

## VI.    DISCUSSION

Claimant first contends the ALJ did not adequately assess the opinion evidence about Claimant's physical health when developing the RFC.  (Doc. 19 at 1, 13-19)  Claimant also argues the ALJ erred by failing to make an express finding about literacy in order to make an adequate assessment of the application of the Medical Vocational Guidelines.  (*Id.* at 1, 19-21)  Finally, Claimant asserts the ALJ was not a proper and constitutionally appointed ALJ, and that her case should be remanded for a new hearing with "a different and constitutionally-appointed ALJ."  (*Id.* at 1, 21-24)

In response, the Commissioner argues that substantial evidence supports the ALJ's assessment of the medical opinion evidence and the ALJ's finding that Claimant had a limited education in the English language, and that Claimant "forfeited her challenge to the

appointment of the ALJ because she did not timely raise that challenge in administrative proceedings."  (Doc. 21 at 9-24)  Each of Claimant's contentions is addressed in order, below.

### A.    The ALJ erred by rejecting the opinions of Drs. Fruchtman and Feldman

Claimant argues the ALJ erred in according only "minimal weight" to the opinions of examining consultative Dr. Fruchtman and treating physician Dr. Feldman, while giving greater weight to the opinion of non-examining state agency reviewer Dr. Roberts.[4]  (Doc. 19 at 13, 14-19)

Dr. Feldman reported he had seen Claimant every two to three months from November 2012 to November 2014, when Dr. Feldman completed an RFC Questionnaire form regarding Claimant's limitations.  (Doc. 15-9 at 92-94)  The doctor listed Claimant's diagnoses as fibromyalgia and chronic pain syndrome, and her symptoms as "chronic widespread pain, fatigue, low back pain [and] paresthesias in hands and feet."  (*Id.*)  Dr. Fruchtman concluded that Claimant was not "physically capable of working an 8-hour day, 5 days a week employment on a sustained basis."  (*Id.* at 93)

Addressing Dr. Feldman's opinions on Claimant's limitations set forth in the November 2014 RFC questionnaire form (Doc. 15-9 at 92-94), the ALJ stated that Dr. Feldman's treatment notes did not support the limitations he identified because Dr. Feldman "treated [Claimant] conservatively, with an unchanged pain medication regimen and periodic injections, which were noted to be successful."  (Doc. 15-3 at 39)

Consultative examiner Dr. Fruchtman diagnosed Claimant with fibromyalgia and a "'typical' do not touch me syndrome."  (Doc. 15-10 at 246)  The doctor opined on Claimant's exertional and postural limitations and ultimately concluded that because of Claimant's fibromyalgia symptoms and chronic pain, she would not be capable of performing a full-time job.  (*Id.* at 249)  Dr. Fruchtman indicated that he based Claimant's

---

[4] Claimant relies on Dr. Roberts' August 2015 opinion in which Dr. Roberts concluded that Claimant would be limited to sedentary work (Doc. 15-4 at 41) but ignores Dr. Roberts' September 2015 opinion that Claimant was limited to light work (*Id.* at 66).

limitations more on her reported symptoms than on objective test results, but concluded Claimant exhibited "typical fibromyalgia pinpoint tenderness." (*Id.* at 248)

The ALJ stated that Dr. Fruchtman "appeared to rely heavily on the claimant's reports of symptoms and limitations" while "diagnostic testing showed mild abnormalities." (Doc. 15-3 at 40)  The ALJ concluded that Claimant's limitations were not as severe as Dr. Fruchtman opined, and that the doctor's opinion was "significantly inconsistent with the weight of the other opinion evidence, which renders it less persuasive." (*Id.*)

The ALJ recognized that Claimant suffered from the severe impairment of fibromyalgia through the date last insured. (*Id.* at 29)  The ALJ found that Claimant's fibromyalgia "significantly limited the claimant's ability to perform basic work activities" and referenced SSR 12-2p (Evaluation of Fibromyalgia). (*Id.* at 33)  However, the ALJ also found that "[g]iven the claimant's history of chronic pain, including degenerative disc disease and fibromyalgia, restriction to the light exertional level was appropriate prior to the date last insured." (*Id.* at 35)  The ALJ concluded that as of April 2015, Claimant's treatment regimen "was stable and appeared successful" and that "her providers indicate successful management of pain and functionality with her unadjusted regimen." (*Id.* at 36)  This conclusion, however, relies on Claimant's statements that she obtained some relief from pain medication and periodic injections providing relief to her low back pain, and ignores Claimant's consistent reporting of high levels of overall body pain despite injection procedures and treatment with narcotic pain medication.  Instead, the ALJ concluded there was "little objective imaging or clinical observation that might support the level of pain and limitation described." (Doc. 15-3 at 36)  As examples, the ALJ cited Claimant's most recent MRI, x-rays of her spine, physical examinations, and neurological tests. (*Id.* at 36-37)  The ALJ also noted evidence that Claimant "was able to perform exercises at physical therapy adequately, for sessions of up to an hour," although she provides no description of what the exercises were. (*Id.* at 37)

1   "In evaluating whether a claimant's residual functional capacity renders them

2   disabled because of fibromyalgia, the medical evidence must be construed in light of

3   fibromyalgia's unique symptoms and diagnostic methods...." *Revels v. Berryhill*, 874

4   F.3d 648, 662 (9th Cir. 2017).  Specifically, fibromyalgia diagnoses are based almost

5   entirely on subjective "reports of pain and other symptoms," and "there are no

6   laboratory tests to confirm the diagnosis." *Benecke v. Barnhart*, 379 F.3d 587, 590 (9th

7   Cir. 2004).

8           The ALJ's decision does not make it clear the extent to which the ALJ arrived at

9   Claimant's RFC based on application of SSR 12-2p, and the extent to which she rejected

10  the opinions of Drs. Feldman and Fruchtman because of a lack of "objective imaging

11  or clinical observation that might support the level of pain and limitation described."

12          These errors undermine the ALJ's ultimate disability decision.  *See Molina v.*

13  *Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012).  Accordingly, this issue requires remand

14  to the ALJ to clarify the extent to which Claimant's fibromyalgia-related symptoms

15  may support the RFC defined for Claimant and to clearly explain how the ALJ has

16  evaluated Claimant's fibromyalgia-related medical evidence, including the opinions of

17  Drs. Fruchtman and Feldman, under SSR 12-2p.  *See Revels*, 874 F.3d at 654-56, 664-

18  68.

19          **B.      The ALJ did not err in relying on VE testimony at Step 5**

20          Claimant contends the ALJ erred at Step 5 of the sequential evaluation when she

21  concluded Claimant was able to perform light level work but was limited to no more than

22  2 hours of standing and/or walking in an 8-hour workday.  (*Id.* at 13-14)  Claimant states

23  that a full range of light work "requires standing or walking, off and on, for a total of

24  approximately 6 hours of an 8-hour workday."  (*Id.* at 13 (citing SSR 83-10))  Claimant

25  further argues that the ALJ was wrong to rely on Vocational Expert testimony identifying

26  positions categorized at the light level that could be performed without being able to meet

27  the requirement of being able to stand and/or walk for 6 hours in an 8-hour workday.

28  Claimant asserts this distinction is important to her case because if she were limited to

sedentary work, she would be deemed disabled under the Medical-Vocational Guidelines or "grids" because of her age and limited education, and because her past relevant work was unskilled.  (*Id.* at 14)

Comparable circumstances were presented in *Moore v. Apfel*, 216 F.3d 864 (9th Cir. 2000).   In *Moore*, the issue was the ALJ's Step 5 "determination whether substantial gainful work exists in the national economy for the claimant despite his impairment." *Moore*, 216 F.3d at 869.  The Ninth Circuit explained that the grids apply to "claimants with substantially uniform levels of impairment" and that "[w]hen the grids do not completely describe the claimant's abilities and limitations, such as when the claimant has both exertional and nonexertional limitations . . ., the grids are inapplicable and the ALJ must take the testimony of a VE." *Id.*  The claimant in *Moore* argued that because he was more than 50 years old, "the 'grid' for 'sedentary' work applicable to his impairment would direct a finding of 'disabled,' and the grid for 'light' work would direct a finding of 'not disabled.'" *Id.* at 870.  The Ninth Circuit declared that the claimant suffered from both "exertional (difficulty standing, bending, etc.) and nonexertional (inability to work around irritating fumes, difficulty expressing himself) limitations." *Id.*  The court concluded that the claimant's exertional limitations placed him between two grids and stated that:

> [w]hen a claimant suffers from both exertional and nonexertional limitations, the grids are only a framework and a VE must be consulted.  *Burkhart*, 856 F.2d at 1340, *Cooper*, 880 F.2d at 1155-56. SSR 83-12 directs that when a claimant falls between two grids, consultation with a VE is appropriate.  SSR 83-12(2)(c).

*Id.*  The Ninth Circuit rejected the argument that the ALJ should have found the light work "was so reduced that it was essentially equivalent to the lower category, 'sedentary' work, which would have meant he was classified as 'disabled.'" *Id.*  The court held that as the claimant suffered from both exertional and nonexertional limitations, the ALJ had to rely on VE opinion before making a determination. *Id.* at 870-71.  The Ninth Circuit further explained that:

SSR 83-12 does not mandate a finding of "disabled." Instead, it mandates the use of a VE, which was exactly the process used in this instance. Moreover, even assuming that the evidence rationally supports Moore's argument, it also clearly supports the ALJ's decision to use a VE, and his subsequent ruling. "Where evidence is susceptible of more than one rational interpretation, it is the ALJ's conclusion which must be upheld." *Gallant v. Heckler,* 753 F.2d 1450, 1453 (9th Cir. 1984). The ALJ's finding that Moore was not disabled because substantial gainful work exists in the national economy was supported by substantial evidence.

*Id.* at 871.

Although Claimant cites to three district court opinions that support her position, two of those decisions, *Merritt v. Colvin*, No. 3:14-cv-05964-KLS, 2015 WL 4039355 (W.D. Wash. July 2, 2015) and *Campbell v. Astrue*, Civil Action No. 09-5356, 2010 WL 4689521 (E.D. Pa. Nov. 2, 2010), do not distinguish or address the Ninth Circuit's opinion in *Moore v. Apfel*. Claimant's third cited case is *McClure v. Comm'r of Soc. Sec.*, No. 15cv1312-LAB-RBB, 2016 WL 4628049 (S.D. Cal. Aug. 9, 2016), *report and recommendation adopted*, No. 15cv1312-LAB (RBB), 2016 WL 4625572 (S.D. Cal. 2016). In *McClure*, the Magistrate Judge appeared to agree with the claimant's argument that *Moore* was not analogous to her case because in *Moore* the claimant was limited to sitting for 4 to 6 hours a day and "there was no indication whether the plaintiff was limited in his standing or walking abilities." 2016 WL 4628049, at *7.

In contrast, numerous district courts within the Ninth Circuit have been asked to decide the issue Claimant raises here, that is, whether an ALJ errs by relying on Vocational Expert testimony about available light work positions even though the claimant is limited to standing and/or walking for a total of just two hours out of an eight-hour workday. *Macumba v. Berryhill*, No. 1-17-cv-01677-SKO, 2019 WL 95462, at **11-14 (E.D. Cal. Jan. 3, 2019); *Gilbert v. Berryhill*, No. 3:16-CV-05695-DWC, 2017 WL 406169, at *4 (W.D. Wash. Jan. 30, 2017); *Lopez v. Colvin*, No. ED CV 15-00976-DFM, 2016 WL 429783, at **2-3 (C.D. Cal. Feb. 3, 2016); *Martinez v. Colvin*, No. 6:14-cv-01703-MC, 2016 WL 270911, at **1-4 (D. Or. Jan. 20, 2016); *Avilez v. Colvin*, No. EDCV 14-0732-

JPR, 2015 WL 1966916, at ** 3-6 (C.D. Cal. Apr. 30, 2015); *Ortiz v. Colvin*, No. ED CV 14-61-AS, 2014 WL 7149544, at *4 (C.D. Cal. Dec. 15, 2014).  In each of these cases the court held that the ALJ did not err at Step 5 where the ALJ identified the claimant's limitations making them incapable of performing the full range of light work and the VE identified light work positions the claimant could still perform.  The Court finds these decisions persuasive.

The ALJ found that, through Claimant's date last insured, she was not able to perform her past relevant work.  (Doc. 15-3 at 41)  Accordingly, at Step 5 of the sequential analysis, the ALJ bore the burden of showing that Claimant could "make an adjustment to other work" based on Claimant's RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(a)(4)(v); 404.1560(c)(1); *Molina*, 674 F.3d at 1110.  The ALJ found that Claimant was 53 years old and thus "defined as an individual 'closely approaching advanced age,'" on her date last insured.  (Doc. 15-3 at 41)  The ALJ also determined that Claimant "has a limited education and is able to communicate in English." (*Id.*)  While the Court concludes the ALJ did not err by relying on Vocational Expert testimony about available light work positions even though she found Claimant was limited to standing and/or walking for a total of two hours out of an eight-hour workday, the ALJ did err by not making a finding on whether Claimant was literate in English, as is explained below.

### C.    The ALJ erred by not making an express finding on Claimant's literacy

Claimant argues the ALJ failed to adequately assess the application of the grids at Step 5 pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 2, § 202.09 and § 202.10 because the ALJ did not expressly find Claimant was literate.  (Doc. 19 at 19-21)  The Court agrees.  The grids are rules that direct findings of "disabled" or "not disabled." *Heckler v. Campbell*, 461 U.S. 458, 467-68 (1983).  The grids are based on vocational factors, such as age, education and work experience, as well as the claimant's RFC determination. 20 C.F.R., Pt. 404, Subpt. P, App. 2 § 200.00(a). Medical–Vocational Rule 202.09 directs a finding of disabled when a person is closely approaching advanced age,

"has a skilled or semi-skilled work history with no transferable skills or an unskilled work history," and is illiterate or unable to communicate in English.  *Silveira v. Apfel*, 204 F.3d 1257, 1261 n. 11 (9th Cir. 2000); 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 2, Rule 202.09.

Here, the issue of Claimant's literacy is critical to the application of the grids because the ALJ found Claimant was closely approaching advanced age, has relevant unskilled work experience that she is no longer able to perform, and where the Claimant argues the ALJ did not find that that Claimant is literate in English.  20 C.F.R. § Pt. 404, Subpt. P, App. 2, Table 2.  It is the ALJ's burden to determine if Claimant is literate. *Silveira*, 204 F.3d at 1261-62.  Under these circumstances, whether Rule 202.09 directs a finding that Claimant is disabled based on her limitation to light work due to her exertional limitations turns on whether she is illiterate or unable to communicate in English.[5] "[Claimant] is illiterate or unable to communicate in English if [she] is either illiterate in English or unable to communicate in English or both."  *See Silveira*, 204 F.3d at 1261 (footnote omitted).

Applicable regulations define "illiteracy" as "the inability to read or write."  *See* 20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1).  The regulations further explain that "We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name."  *Id.*  The regulations applicable to the ALJ's decision defined the "ability to communicate in English" as "the ability to speak, read and understand English."  *See* 20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5).

Claimant challenges the ALJ's finding that Claimant had a limited education for the purposes of 20 C.F.R. § 404.1564.  "A distinction exists between an assessment of literacy and an assessment of the ability to communicate in English.  An ALJ must consider both in determining whether a claimant can perform work pursuant to the regulations."

---

[5] It bears noting that when the VE provided the ALJ with a list of three positions that the hypothetical individual could perform, the VE noted she was providing these representative positions without "taking into consideration the language."  (Doc. 15-3 at 94)

*Calderon v. Astrue*, No. 1:08-cv-1015 GSA, 2009 WL 3790008, at *9 (E.D. Cal. Nov. 10, 2009) (citing 20 C.F.R. §§ 404.1564(b), 416.964(b)).   Illiteracy is "define[d] as 'the inability to read or write,'" and "refers to literacy in English."   *Silveira*, 204 F.3d at 1261 (quoting 20 C.F.R. § 416.964(b)(1)).   Communication in English concerns "the ability to speak, read and understand English...." 20 C.F.R. § 404.1564(b)(5).   The "failure to make a finding as to literacy and to provide reasons for the finding made as to English communication abilities warrant remand for determination of these issues."   *Garcia v. Astrue*, No. 1:11-cv-1956-SKO, 2013 U.S. Dist. LEXIS 12758, at *20, 2013 WL 394517 (E.D. Cal. Jan. 30, 2013); *see also Silveira*, 204 F.3d at 1261-62 (remanding case where the ALJ made no express finding that the claimant was literate in English); *Calderon*, 2009 WL 3790008, at *10 ("because the capability to communicate in English pertains to one who can 'speak, *read*, and understand' the language, the lack of information in the record pertaining to Plaintiff's ability to read is insufficient to uphold the ALJ's finding regarding Plaintiff's ability to communicate") (internal quotation omitted, emphasis in original).

The Commissioner argues that substantial evidence supports a conclusion that Claimant can read and write in English.  (Doc. 21 at 15-165)  In her unfavorable decision, however, the ALJ did not make any express findings regarding Claimant's literacy.  She stated, without providing evidence in support, that Claimant had a "limited education" and also concluded that Claimant "is able to communicate in English." (Doc. 15-3 at 41)  The ALJ supported her finding that Claimant was able to communicate in English with evidence Claimant had communicated in English at the hearing associated with her previous application for benefits, and that her treating physicians' appointment notes do not indicate that Claimant needed to use an interpreter, required consultation in Spanish, or otherwise had difficulties in communication.  (*Id.* at 41-42)  Additionally, the ALJ cited to the psychological examination conducted by Dr. Haley, and noted that Dr. Haley reported Claimant was bilingual in Spanish and English, that Claimant only occasionally asked for clarification on questions, and that Claimant proceeded during the examination without an interpreter, understood and answered simple questions in English, and did not exhibit

word-finding issues.  (*Id.* at 42)  That the ALJ's focus was solely on evidence that Claimant could speak and understand some English begs the question of whether Claimant has sufficient ability to read and write in English.

The Court reviews only the "reasoning and factual findings offered by the ALJ–not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."  *Bray v. Comm'r of Soc. Sec.*, 554 F.3d 1219, 1226 (9ᵗʰ Cir. 2009) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)); *see also Garrison v. Colvin*, 759 F.3d 995, 1010 (9ᵗʰ Cir. 2014) ("We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely.").  The ALJ made no finding regarding Claimant's literacy in English, and the decision is subject to remand on that basis.

### D.    Claimant's appointments clause challenge is untimely and is therefore waived

Claimant argues that the ALJ who adjudicated her case was not constitutionally appointed.  (Doc. 19 at 21-24)  As such, she maintains that her case should be remanded for a new hearing with a different and constitutionally appointed ALJ should the Court find no error elsewhere.  (*Id.*)

Under the Appointments Clause of the Constitution, art. II, § 2, cl. 2, "[o]nly the President, a court of law, or a head of department" may appoint "Officers of the United States."  *Lucia v. S.E.C.*, __U.S.__,138 S.Ct. 2044, 2051 (2018).  In *Lucia*, the Supreme Court held that ALJs within the Securities and Exchange Commission ("SEC") qualified as such "Officers."  *Id.* at 2049.  The claimant in *Lucia* appeared before an ALJ of the SEC and alleged that the administrative proceeding was "invalid" because the ALJ had not been constitutionally appointed.  *Id.* at 2050.  The Supreme Court agreed and held that the proper remedy was for the SEC to hold a new hearing with a different and constitutionally appointed ALJ.  *Id.* at 2055.  It further held that such challenges must be "timely" in order for relief to be granted.  *Id.*  Because the claimant in *Lucia* had "contested the validity of [the ALJ's] appointment before the [SEC]," his challenge was "timely" and he was

1  therefore entitled to relief.  *Id.*

2      Here, because Claimant failed to raise an Appointments Clause challenge at her

3  hearing, Claimant's challenge is untimely and forfeited.  *Meanel v. Apfel*, 172 F.3d 1111,

4  1115 (9th Cir. 1999) ("[A]t least when claimants are represented by counsel, they must raise

5  all issues and evidence at their administrative hearings in order to preserve them on

6  appeal."); *see Shaibi v. Berryhill*, 883 F.3d 1102, 1109 (9th Cir. 2017); SSR 19-1p, 2019

7  WL 1324866, at *3 (Mar. 15, 2019).  In arguing the contrary, Claimant cites to *Sims v.*

8  *Apfel*, 530 U.S. 103, 112 (2000), in which the Supreme Court held that claimants need not

9  raise issues before the Appeals Council in order to preserve judicial review of those issues.

10  (Doc. 19 at 23-24)  However, the issue of whether a claimant needed to exhaust all issues

11  before the ALJ was not before the Supreme Court in *Sims*.  *Id.* at 107.  Thus, in *Shaibi v.*

12  *Berryhill*, which postdates *Sims*, the Ninth Circuit acknowledged that the holding in *Sims*

13  did not disturb the Circuit's rule announced in *Meanel* that claimants need to have raised

14  all issues at their administrative hearings in order to preserve the issues on appeal.  883

15  F.3d at 1109.  Accordingly, the Court finds Claimant's Appointments Clause challenge

16  here is untimely for failure to raise the issue at her administrative hearing.

17      The Ninth Circuit has not ruled specifically on the applicability of the Appointments

18  Clause and timeliness of challenges to ALJs within the Social Security Administration.

19  However, the Court's holding here is consistent with district court decisions on this

20  question within the Ninth Circuit.  *See, e.g., Roland P. v. Saul*, No. EDCV 19-1216-JPR,

21  2020 WL 2556349, at *3 n.3 (C.D. Cal. May 20, 2020); *Latosha v. Saul*, No. ED CV 18-

22  2475-SP, 2020 WL 1853310, at **7-8 (C.D. Cal. Apr. 13, 2020); *Jason D. v. Saul*, No.

23  3:19-CV-00176-SLG, 2020 WL 1816470, at *15 (D. Alaska Apr. 10, 2020); *Wendy R. v.*

24  *Comm'r, Soc. Sec. Admin.*, No. 6:19-cv-00176-SU, 2020 WL 1172694, at *6 (D. Or. Mar.

25  10, 2020); *Montijo v. Comm'r of Soc. Sec. Admin.*, No. CV-19-1088-PHX-ESW, 2020 WL

26  813771, at *5 (D. Ariz. Feb. 19, 2020); *Younger v. Comm'r of Soc. Sec. Admin.*, No. CV-

27  18-02975-PHX-MHB, 2020 WL 57814, at *5 (D. Ariz. Jan. 6, 2020) (collecting cases);

28  *James A. v. Saul*, No. 19-cv-00104-TSH, 2019 WL 4600940, at *15 (N.D. Cal. Sept. 23,

2019).

## VII.   REMAND FOR FURTHER PROCEEDINGS

Claimant urges the Court to remand for payment of benefits or, alternatively, for additional proceedings.  (Doc. 19 at 24-25)  The Commissioner urges the Court to affirm the Commissioner's final decision or, alternatively, to remand for further proceedings. (Doc. 21 at 24-26)

In the Ninth Circuit, a remand with instruction to award benefits is appropriate if each of three circumstances exist:  "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence …; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand."  *Garrison*, 759 F.3d at 1020.  A court's decision to remand a disability benefits case to the Social Security Administration for payment of benefits or for further proceedings is discretionary.  *Harman v. Apfel*, 211 F.3d 1172, 1173 (9th Cir. 2000). However, remand for an award of benefits is granted only in "rare circumstances," "where no outstanding issues remain and further proceedings would not be useful" and where "the record, taken as a whole, leaves not the slightest uncertainty as to the outcome of [the] proceeding."  *Treichler*, 775 F.3d at 1100-01 (citation and internal quotation marks omitted).  *See also Leon v. Berryhill*, 880 F.3d 1041, 1044 (9th Cir. 2017), amended Jan. 25, 2018 ("An automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule.")  Instead, generally the court will "remand to the agency for additional investigation or explanation." *Treichler*, 775 F.3d at 1099 (citation and internal quotation marks omitted).

In *Treichler*, the Ninth Circuit cited with approval its earlier decision to remand a case after an ALJ "erred in making inadequate findings to support his conclusion that the claimant was not credible" and to allow "'further findings evaluating the credibility of [claimant's] subjective complaints,' while noting that on remand the ALJ could deny benefits if he made adequate findings."  *Id.* (quoting *Byrnes v. Shalala*, 60 F.3d 639, 642

(9th Cir. 1995)).  Moreover, this Court cannot conclude that the record provides "not the slightest uncertainty as to the outcome."  *Id.* at 1101.

For the reasons set forth above, further proceedings are appropriate here because the ALJ must make an express finding regarding Claimant's literacy in English and must also explain clearly the application of SSR 12-2p to Claimant's medical record and the opinions of Drs. Feldman and Fruchtman while defining Claimant's RFC.

Accordingly,

**IT IS ORDERED** that the final decision of the Commissioner of Social Security is **VACATED** and this matter is **REMANDED** to the Commissioner for further proceedings consistent with this Order.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment.

Dated this 28th day of May, 2020.

_____
Honorable Deborah M. Fine
United States Magistrate Judge